**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CAMERON JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17 C 2132 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| NANCY A. BERRYHILL, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Jamika Talley seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her son, Cameron's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). 42 U.S.C. § 1382c(a)(3)(A). Ms. Talley asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

**I.**
**PROCEDURAL HISTORY**

Ms. Talley applied for SSI on behalf of Cameron on February 28, 2011, just two weeks after he was born. Cameron weighed just one pound, eleven ounces at birth, and also suffered from hydrocephalus. (Administrative Record (R.) 105). Cameron was granted disability benefits on May 11, 2011. (R. 71, 105). The Administration reviewed Cameron's case a couple of years later and determined that his disability ceased as of February 20, 2013, and that his benefits would be terminated as of April 30, 2013. (R. 72). Ms. Talley requested reconsideration of this determination and, when that was unsuccessful, an administrative hearing.

An administrative law judge ("ALJ") convened a hearing on April 23, 2015, at which Ms. Talley and her son's caregiver, Michelle Walker[1], appeared and testified. (R. 40-70). Ms. Talley and her son were not represented by counsel.[2] On June 22, 2015, the ALJ issued a decision finding that Cameron was no longer disabled as of February 20, 2013. Although Cameron suffered from multiple, severe impairments – speech impairment, hydrocephalus, borderline intellectual functioning, and pervasive development disorder – he no longer had an impairment or combination of impairments resulting in either marked limitations in two domains of functioning or and extreme limitation in one domain of functioning. (R. 10-21). The ALJ determined that Cameron had a marked limitation in acquiring and using information, no limitation in attending and completing tasks, less than a marked limitation in interacting with others, less that a marked limitation in moving about and manipulating objects, no limitation in caring for himself, and less than a marked limitation in health and physical well-being. (R. 19-21). The ALJ's decision then became the final decision of the Commissioner when the Appeals Council denied Ms. Talley's request for review of the decision on January 24, 2017. (R. 1-6). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Talley has

---

[1] Throughout the hearing transcript, this individual is identified, and identified herself, as Michelle Walker (R. 40, 41, 63). But throughout his decision, the ALJ refers to the caregiver as Montrel Walker. (R. 10, 16).

[2] Ms. Talley chose to proceed without counsel at her hearing, explaining that she had been waiting a year and Legal Aid could not take her case. (R. 41-42). To ensure a valid waiver or representation, an ALJ must explain to pro se claimants "(1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).

At the hearing, the ALJ did not explain that attorney's fees would be limited to 25% of back benefits. (R. 42-42). Ms. Talley did receive an eight-page notice of hearing packet that included this information in writing on the final page. (R. 139). But, the validity of waiver of counsel is not an argument the plaintiff has raised, and so it is deemed waived. *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016).

appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE OF RECORD

### A.
### Medical Evidence

The record in this case comes in at just over 1600 pages, but the vast majority of it plays no role in the ALJ's decision and, instead, pertains to Cameron's condition and treatment before the ALJ's cessation date of February 20, 2013. The ALJ's discussion of the evidence begins with a report regarding Cameron's ability to walk and balance in December of 2012. The ALJ stated that [Cameron] could walk as he approached his second birthday." (R. 17). The report actually indicated that, at age 22 months, he was making progress, and could squat and pick up toys without losing his balance on most occasions. He was able to stop walking without falling on most occasions, and could negotiate a 2-inch obstacle about half the time. (R. 1322). He was saying a few words on his own, could imitate a greeting, but was unable to ask for toys. (R. 1324).

Cameron had a consultative examination with Dr. Luella Bangura, on February 12, 2013, the day before his second birthday. The doctor noted that Cameron had been seeing a pediatrician, a physical therapist, and a developmental therapist. He was not on any medication, but had had brain surgery in 2011 and shunt placement in 2012. Cameron was 33 inches tall and weighed 25 pounds. The shunt had caused some problems with his right eye movements, and the Dr. Bangura noted that it deviated toward the right, but that ocular movements were intact and visual fields were normal. Dr. Bangura said that gait and station were appropriate, but also noted that Cameron fell and lost his balance. Motor strength, reflexes, sensation, grip strength, and manual dexterity were deemed

normal. (R. 1397-98).

Cameron had a speech and language evaluation with Kimberly A. Kirk, M.A., on March 14, 2013. Cameron was unable to put two words together and had a limited vocabulary for his age. He was unable to follow simple one-step commands, even with verbal and visual cues. His speech was essentially unintelligible. He communicated primarily by pointing. Ms. Kirk administered the Preschool Language Scale, and determined that Cameron's auditory comprehension was in just the 1st percentile, expressive communication was at the 6th percentile, and total language was at the 1st percentile. (R. 1400-04). Cameron was uncooperative and could not complete the Goldman-Fristoe Test of Articulation 2. (R. 1410).

A week later, Dr. Wilson reviewed Cameron's file on behalf of the state agency. He indicated the file was insufficient because there had not yet been a Bayley exam. (R. 1422, 1427). However, based on Cameron's recent speech and language evaluation with Dr. Kirk, Dr. Wilson opined that Cameron had a marked limitation in using and acquiring information. While all but 5% of Cameron's speech was unintelligible, the doctor oddly concluded his speech imposed "less than a marked limitation" on his ability to interact with others. (R. 1424). He thought Cameron had no limitation in moving about or manipulating objects, but indicated, again, that a Bayley exam was needed. (R. 1425). He gave no opinion as to Cameron's limitations in the area of caring for oneself or attending and completing tasks. (R. 1424-25).

A few months later, in July 2013, Cameron had another consultative examination with Michele C. Thorne, Ph.D. Dr. Thorne noted that Cameron ran around the waiting room and played with a ball. He was curious about his surroundings and engaged in social smiling and interacted with her. Dr. Thorne administered the Bayley Scales of Infant Development. The results indicated that,

in the cognitive domain, Cameron was in the bottom five percent. In the language domain, he was in the bottom three percent, and he was in the bottom sixteen percent in motor functioning. Cameron fared even more poorly in the social-emotional domain and the adaptive behavior domain, where he scored in just the bottom 0.1 percent. Dr. Thorne said these scores were consistent with her observations during the session. The conceptual composite score was also in the lowest 0.1 percent, while Cameron's social composite score was in the lowest one percent. His practical composite score, which was a gauge of a child's ability to engage in leisure activities and self-care, was in the bottom 0.2 percent. (R. 1461-62).

With the Bayley exam now in the file, Dr. Steven Roush performed a review on July 23, 2013. The doctor seemingly accepted the Bayley results for the acquiring and using information domain, finding a marked limitation. He seemingly rejected the test for the social domain, where Cameron had scored in the bottom one percent, and found Cameron had a less than marked limitation. He echoed Dr. Wilson's assessment from prior to the Bayley exam – he seemed to copy it exactly – that Cameron's unintelligible speech didn't hinder his ability to interact with others to any significant degree. (R. 1467). The doctor found no limitation at all in moving about and manipulating objects, but noted the Bayley score placing Cameron in the bottom sixteen percent in this category. (R. 1468). Dr. Roush also said there was no limitation in caring for onself. (R. 1468).

In May 2013, Cameron was suffering from headaches and vomiting, and exhibiting bulging fontanelle. (R. 1520. 1524). On May 21, 2013, a CT scan showed Cameron's shunt in place and no evidence of hydrocephalus. (R. 1435). There was no motor weakness noted, and fine motor skills and coordination were normal. (R. 1479). A year later, a CT scan showed no evidence of hydrocephalus, but severe volume loss of white matter, cerebellar vermis, and cerebellar hemisphere,

likely due to complications from prematurity. (R. 1487). In September 2014, Cameron began experiencing seizure activity, as well as fever and lethargy, but a CT scan showed no evidence of acute intercranial process. (R. 1516-17). The headaches and vomiting continued into November, and Cameron would go three days a week without eating. (R. 1510). Dr. Young reported that balance, gait, and coordination were all normal, and that speech was "fluent and appropriate for his age." (R. 1510). The doctor thought there might be some intermittent shunt malfunction, and he recommended an elective shunt revision. (R. 1510).

## B.
## Administrative Hearing Testimony

At the hearing, Ms. Talley testified that Cameron needed additional surgery, but that it was difficult for her to take off more time from work because Cameron was getting sick about three days a week. (R. 46). He would get headaches, throw up, and become lethargic. (R. 52). His shunt was apparently malfunctioning. (R. 46). She said that, while Cameron was the same age as her fiancee's son, he was clearly behind. (R. 49). When he talked, his sentences were jumbled, and he was difficult to understand. (R. 46-47). He had trouble understanding what he was told and would become frustrated and cry a lot. (R. 50-51). The same would happen when he couldn't accomplish a task, like getting dressed. (R. 56). Ms. Talley felt like Cameron was getting worse as he got older and, with him falling behind other children and getting sick all the time, couldn't fathom how the Social Security Administration determined that he had gotten better. (R. 59-60).

Cameron's daycare provider testified that he was not like a normal four-year-old. He was on a much lower level. (R. 66). He wouldn't play with other children or interact with them. (R. 64). He didn't understand language the way the other children did; you had to show him things rather

6

than tell him. (R. 65). He was very clumsy getting around, and didn't seem to see obstacles. (R. 66).

## III.
## THE ALJ'S DECISION

The ALJ stated that Cameron was a preschooler and had been an older infant as of February 20, 2013. (R. 14). He determined that Cameron suffered from the following severe impairments: speech impairment, hydrocephalus, borderline intellectual functioning, and pervasive development disorder. (R. 14). The ALJ found that, as of February 20, 2013, Cameron's impairments did not meet or equal the requirements of any listed impairment; specifically, listings 102.00B for marked limitation of speech or language, listing 111.08 insofar as it could be applied to hydrocephalus, or listing 112 covering pervasive development disorder. (R. 15). Similarly, the ALJ determined that Cameron's impairments did not functionally equal the listings because he did not have a marked limitation in two areas of functioning or an extreme limitation in one area of functioning. (R. 15-21). Instead, the ALJ found that, beginning February 20, 2013, he had a marked limitation in just one area: acquiring and using information. The ALJ found he had no limitation in attending and completing tasks, a less than a marked limitation in interacting with others, a less that a marked limitation in moving about and manipulating objects, no limitation in caring for himself, and a less than a marked limitation in health and physical well-being. (R. 19-21). The ALJ also found the statements of Ms. Talley and Cameron's daycare provider were not credible to the extent they were inconsistent with his finding that Cameron was no longer disabled. (R. 16-17).

## IV.
## DISCUSSION
### A.
### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The

court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Schloesser v. Berryhill,* _F.3d_, 2017 WL 3908927 (7th Cir. 2017). *See also Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Berger*, 516 F.3d at 544; *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). *See also Schloesser, supra*. Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott,* 297 F.3d at 595. In other

words, as with any well-reasoned decision, the ALJ must rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence is not persuasive. *Berger*, 516 F.3d at 544.

**B.**
**Sequential Analysis**

A child is disabled under the Act if he has a "physical or mental impairment, which results in marked and severe functional limitations, and . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). Whether a child meets this definition is determined via a multi-step inquiry. 20 C.F.R. § 416.924(a); *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007); *Giles ex rel. Giles v. Astrue,* 483 F.3d 483, 486-87 (7th Cir.2007). At the outset, if the child is engaging in substantial gainful activity, his claim will be denied. *Murphy*, 496 F.3d at 633; *Giles,* 483 F.3d at 486. Next, if she does not have a medically severe impairment or combination of impairments, his claim will be denied. *Murphy*, 496 F.3d at 633; *Giles,* 483 F.3d at 486. Finally, the child's claim will be denied unless her impairment meets, or is medically or functionally equivalent to, one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Murphy*, 496 F.3d at 633; *Giles,* 483 F.3d at 486-87.

The determination of functional equivalency involves a further analysis of the child's condition in the context of six "domains" or categories, from an age-appropriate standpoint: 1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for oneself, and 6) health and physical well-being. 20 C.F.R. § 416.926a(a), (b)(1); *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 487. A child's impairment is functionally equivalent to the listings, meaning the child qualifies for benefits,

if the ALJ finds he or she has marked difficulty in two domains of functioning or an extreme limitation in one. 20 C.F.R. § 416.926a(a); *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 487. A marked limitation is one which interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(I); *Giles*, 483 F.3d at 487. It is further defined as "more than moderate, but less than extreme," and can be demonstrated by standardized test "scores that are at least two, but less than three standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(I). An extreme limitation is present where the results of a standardized test are three or more standard deviations below the norm for the test, or when an impairment interferes very seriously with the child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(3).

## C.

In reaching his decision that Cameron was no longer disabled, the ALJ relied in large part on two reports from the doctors who reviewed Cameron's files on behalf of the state agency:

> State agency consultants concluded that the claimant has hydrocephalus, pervasive developmental disorder and borderline intellectual functioning (Exhibits 12F and 16F). These consultants reported that language imposes a marked limitation in acquiring and using information. Speech reportedly imposes a less than marked limitation in interacting and relating with others. Although the State agency consultants originally concluded that the claimant's shunt causes less than marked limitation in health and well-being, the State agency consultants ultimately concluded that the claimant has no limitation in this area. The claimant reportedly has no limitations in attending and completing tasks, moving about and manipulating objects and caring for yourself.
>
> The State agency opinions are based on a thoughtful review of the objective medical evidence. There are no contradictory opinions of record. However, the more recently received medical evidence indicates that the claimant is now having some problems with his shunt functioning and is in need of a shunt revision. The original State agency conclusion to the effect that the shunt imposes some limitation in the area of health and well-being currently seems more accurate. The State agency conclusions are otherwise very probative of the claimant's limitations and entitled to great weight.

10

(R. 18-19). As already noted, the first review was done on March 20, 2013, and indicated that a Bayley exam would be necessary. Without it, the reviewing doctor found that Cameron was markedly limited in acquiring and using information and less than markedly limited in being able to interact with others.

After the Bayley exam, which reiterated Cameron's rather significant difficulties with age-appropriate communication and also indicated even worse difficulties in cognitive abilities, social interaction, and caring for onself, a second reviewing doctor once again found him markedly limited in acquiring and using information, and less than markedly limited in being able to interact with others, and not limited at all in caring for oneself. The reviewer noted absolutely no limitation in moving about and manipulating objects, while the Bayley exam indicated that Cameron was in the bottom 16 percent in this area. Thus, it would seem that the results of the Bayley exam had little or no influence on the state agency review which, as already noted, was essentially the basis of the ALJ's opinion. The ALJ didn't even mention the results of the Bayley exam in his decision. But those test results certainly appear to undermine not only the ALJ's decision, but the state agency reviewer's opinion as well. As there is no discussion of them in the ALJ's decision, one cannot know what role they played in this determination, if any.

First there is the domain of "Acquiring and Using Information." The reviewers allowed that Cameron had a marked limitation in acquiring and using information. But Cameron's conceptual cognitive score, said to measure his cognitive abilities, was in the 0.1 percentile, three standard deviations below the mean. According to the Commissioner's regulations, this should translate to an extreme limitation, *see* 20 C.F.R. § 416.926a(e)(3), which would mean Cameron is disabled. 20 C.F.R. § 416.926a(a); *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 487. While the second reviewer

11

did mention the cognitive score, it's unclear from his comments how the score factored into his opinion, if it did at all. (R. 1467). The ALJ's explanation was limited to noting that Cameron payed with toys and balls, and that his behavior appears normal in many respects. (R. 19). Playing with a ball would seem to have little or nothing to do with "acquiring and using information," and the record replete with examples of Cameron's behavior not being normal for his age.

The domain of "Interacting and Relating with Others" comes with similar issues. While the reviewer found that Cameron had less than a marked limitation in interacting and relating with others, the Bayley exam indicated that Cameron was functioning in the lowest 0.1 percent when it came to social abilities. Again, that is three standard deviations below the mean, which would mean Cameron is disabled. *See* 20 C.F.R. §§ 416.926a(e)(3); 416.926a(a); *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 487. The reviewer indicated that 5% intelligible speech was a less than marked limitation on interaction – which, to say the least, is counterintuitive – but offered no further explanation for rejecting the Bayley exam results. For his part, the ALJ was impressed with the seemingly inconclusive fact that Cameron smiled at Dr. Thorne, the consultative doctor who administered the Bayley exam indicating an extreme limitation. But discarding the results of a test in favor of a smile on a single occasion runs afoul of at least two lines of Seventh Circuit caselaw. *See Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016)(rejecting the "cherry-picking" or "snapshot" method of assessing the record); *Scrogham v. Colvin*, 765 F.3d 685, 688 (7th Cir. 2014)(". . . even if we confined our review of the record to the snapshots of evidence that the ALJ considered, we do not think that this limited evidence builds the required logical bridge to her conclusions."). *See also Israel v. Colvin*, 840 F.3d 432, 439 (7th Cir. 2016)("There is always a danger when lawyers and judges attempt to interpret medical reports and that peril is laid bare here.").

Then, there is the domain of "Caring for Oneself." Cameron's score in the practical composite scale, which measures, in part, a child's ability to engage in self-care, was in the lowest 0.2 percent. This placed him very nearly three standard deviations below the norm, which should mean he had a marked limitation in this area. *See* 20 C.F.R. § 416.926a(e)(2)(i). This would translate into a finding that he was disabled, given a marked limitation in any other area, *see* 20 C.F.R. § 416.926a(a); *Murphy*, 496 F.3d at 633; *Giles*, 483 F.3d at 487, which both the reviewer and the ALJ conceded he had in the domain of acquiring and using information. The reviewer offered no explanation for his finding of no limitation at all, while the ALJ explained that Cameron "does not endanger himself or others." (R. 20). Again, this is tantamount to the ALJ playing doctor while at the same time ignoring evidence of disability and failing to explain why he rejected it.

Now, the ALJ may have had good reasons for rejecting the test results in favor of the state agency reviewer's opinion. And, likewise, the reviewer may have had a valid reason for disregarding the tests results the initial reviewer deemed necessary to an opinion. Similarly, the reviewers and the ALJ may have valid rationales for their seemingly curious interpretations of the test results. But, we have no indication of what those reasons might be, and that runs afoul of the Seventh Circuit's mandate that ALJ's provide a logical bridge from the evidence to their conclusions. *Brown v. Colvin*, 845 F.3d 247, 251 (7th Cir. 2016); *Ghiselli v. Colvin*, 837 F.3d 771, 779 (7th Cir. 2016); *O'Connor–Spinner v. Colvin*, 832 F.3d 690, 698 (7th Cir. 2016). Again, it may well be that there are valid reasons for ignoring the test results, or interpreting them in such a way as to find Cameron not disabled, but even if there is substantial evidence in the record supporting the ALJ's ultimate conclusion, without an adequate explanation of the path of his reasoning, the case must be remanded. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(" . . . but we cannot uphold a decision by

13

an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."). In the end, all that can be drawn from the ALJ's decision is that he simply accepted, uncritically, the non-examining reviewer's opinion. This, the ALJ could not do, especially when that opinion seemingly conflicts with the Bayley exam results. *Thomas v. Colvin*, 826 F.3d 953, 962 (7th Cir. 2016); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014). Accordingly, this case must be remanded.[3]

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for remand [Dkt. #16] is GRANTED, and the defendant's motion for an affirmance of the ALJ's decision is DENIED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 9/14/17

---

[3] Plaintiff asks that the ALJ's decision be reversed and an award of benefits ordered. "It remains true that an award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability." *Allord v. Astrue*, 631 F.3d 411, 417 (7th Cir. 2011). As the remand here comes under the Seventh Circuit's "logical bridge" requirement, an award of benefits is not appropriate without further administrative proceedings.

14